UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Elizabeth F. Warner,
     Plaintiff

     v.                                    Case No. 20-cv-514-SM
                                           Opinion No. 2024 DNH 027

Louise DeJoy[1], Postmaster
General, on behalf of the
United States Postal Service,
     Defendant


**O R D E R**


     Elizabeth Warner has worked for the United States Postal

Service since 1998.  In January of 2018, she applied for a

promotion to the position of Postmaster of the Durham, New

Hampshire, post office.  She did not receive that promotion and

the job was offered to a younger man who, according to Warner,

had significantly less experience.  Later that year, Warner

applied to become the Postmaster of Somersworth, New Hampshire.

She did not receive that promotion either and, once again, she

says the position was offered to a younger man with less

_____

[1]     Plaintiff originally named as defendant Megan J. Brennan,
the former Postmaster General.  But, on June 15, 2020, Louise
DeJoy was appointed Postmaster General of the United States.

experience.  Warner attributes her inability to secure those
promotions to both gender and age discrimination.

The United States Postal Service ("USPS") denies that
Warner's age or gender played any role in the selection of the
new Postmasters for Durham and Somersworth.  Indeed, says the
USPS, the undisputed material facts of record establish that it
had legitimate, nondiscriminatory reasons for choosing
applicants other than Warner for those positions.  Moreover, the
USPS asserts that there is insufficient evidence of unlawful
discrimination to permit a rational trier of fact to conclude
that Warner has any viable causes of action.  Accordingly, it
moves for summary judgment on all remaining claims in Warner's
complaint.  Warner objects.

For the reasons discussed, the government's motion for
summary judgment as to both of Warner's remaining discrimination
claims is granted.

## Standard of Review

When ruling on a motion for summary judgment, the court is
"obliged to review the record in the light most favorable to the
nonmoving party, and to draw all reasonable inferences in the
nonmoving party's favor."  Block Island Fishing, Inc. v. Rogers,

844 F.3d 358, 360 (1st Cir. 2016) (citation omitted).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit."  Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted).  Where a genuine dispute of material fact exists, such a dispute must be resolved by a trier of fact, not by the court on summary judgment.  See, e.g., Kelley v. LaForce, 288 F.3d 1, 9 (1st Cir. 2002).

When objecting to a motion for summary judgment, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact."  Perez v. Lorraine Enters., 769 F.3d 23, 29–30 (1st Cir. 2014).  In other words, "a laundry list of possibilities and hypotheticals" and "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment."  Tobin v. Fed. Express Corp., 775 F.3d 448, 451–52

(1st Cir. 2014).  See generally Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 249 (1986).


### Background

Warner began working for the USPS in 1998.  Before the
events at issue, she had held a variety of jobs within the USPS,
ranging from level 16 to as high as level 20 (an interim
position she held while another employee was on leave).
Generally speaking, the higher the level of a position, the
greater the responsibilities, benefits, and salary.  In June of
2022, after the events underlying this suit, Warner was promoted
to Postmaster of Hampton, New Hampshire - a level 21 position -
where she currently works (or worked, as of the date of her May,
2023, deposition).


Two years before her promotion to Postmaster of Hampton,
Warner applied for a level 20 position as Postmaster of Durham,
New Hampshire.  That position offered both an increase in salary
and benefits over her then-current job.  Kathleen Hayes, the
Post Office Operations Manager ("POOM") for the Northern New
England District and Warner's direct supervisor, interviewed
Warner for the position.  Warner was not offered the job, which
was, instead, offered to Mr. Minigan, a younger male applicant.
At the time, Minigan was 36 years old.  Warner was 58.  Warner

says Ms. Hayes informed her that she decided to hire Minigan for the position because he had more experience of the sort needed for that particular job.  Warner offers no direct evidence that she was the victim of unlawful discrimination, but claims that the USPS's explanation is a pretext for both age and gender-based discrimination.

A few months later, in the summer of 2018, Warner applied for another vacant level-20 postmaster position - this time in Somersworth, New Hampshire.  Warner alleges that during the course of her interview for that job, Hayes made two statements that reveal an underlying bias against women and older employees (notwithstanding that Hayes is both).  Those statements are the foundation upon which Warner's discrimination claims are built, so they are worth stating specifically:

> First, Warner alleges that Hayes said, "I don't think we have ever had a woman Postmaster in Somersworth.  I wonder how that would work" - or something to that effect.  Warner points to that statement as evidence of Ms. Hayes's <u>gender</u> bias.

> Next, Warner alleges that during the same interview, Hayes asked her whether she believed she "had the energy" to be the Postmaster of Somersworth (which was known to be a difficult post office to manage) - a question Warner says evidences Hayes's <u>age</u> bias.

Warner was not hired as the Postmaster of Somersworth and later learned that the position had been offered to Mr. Adams, a

53 year-old man.  Adams had been the Postmaster in South
Berwick, Maine, and expressed a desire to relocate to New
Hampshire (his granddaughter had been diagnosed with a medical
condition and he wished to be closer to his family).  In
essence, Adams was seeking (and secured) a lateral transfer from
Maine to New Hampshire.  Warner again points to age and gender-
based discrimination as the reason she was not offered the
position.  She advances claims under the Age Discrimination in
Employment Act ("ADEA"), 29 U.S.C. § 621, et seq. (count one)
and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §
2000e-2(a)(1) (count two).


## Discussion

I.   <u>Timeliness</u>.

As a preliminary matter, the USPS asserts that Warner's
claims arising out of the denied promotion to Postmaster of
<u>Durham</u> are untimely.  Because she is a federal employee, Warner
is subject to a somewhat atypical administrative exhaustion
requirement.  As the Supreme Court has noted, "Before a federal
civil servant can sue his employer for violating Title VII, he
must, among other things, 'initiate contact' with an Equal
Employment Opportunity counselor at his agency 'within 45 days
of the date of the matter alleged to be discriminatory.'"  <u>Green</u>

v. Brennan, 578 U.S. 547, 549–50 (2016) (quoting 29 CFR §
1614.105(a)(1)).

All agree that Warner did not contact an EEOC counselor
until September 11, 2018 - significantly more than 45 days after
receiving notice that she had not secured the promotion to
Postmaster of Durham.  So, says the USPS, any claims arising out
of that allegedly discriminatory "failure-to-promote" are time-
barred.  But, as Warner points out, a failure to exhaust
administrative remedies is not jurisdictional.  Rather, the
deadlines established to pursue administrative remedies are more
akin to brief statutes of limitation and are, therefore, subject
to equitable tolling.  See Nat'l R.R. Passenger Corp. v. Morgan,
536 U.S. 101, 113–14 (2002).  Critically, however,

> In the context of litigation initiated by federal
> employees, we have noted that administrative
> exhaustion is a condition to the waiver of sovereign
> immunity and, therefore, must be strictly construed.
> It is only in exceptional circumstances that equitable
> tolling will extend a filing deadline.  To this end,
> the heavy burden of proving entitlement to equitable
> relief lies with the complainant.

Bartlett v. Dep't of the Treasury (I.R.S.), 749 F.3d 1, 9–10
(1st Cir. 2014) (citations and internal punctuation omitted).

In support of her claimed entitlement to equitable tolling, Warner argues that she did not have "unequivocal" notice that she had been the victim of unlawful discrimination until August 17, 2018 (when, during the interview for the Somersworth position, Ms. Hayes made the statements Warner says evidence her age and gender bias).  That is to say, with respect to the Durham position, Warner obviously knew that she had been subject to an adverse employment action: she did not receive the promotion, which was offered to a younger man.  But, as she sees things, she had no reason to believe that she was the victim of unlawful discrimination until much later, when she subsequently interviewed for the vacant Somersworth Postmaster position.  It was during that later interview on August 17, 2018, that she claims to have discovered that Hayes harbored an animus against women and older employees.  And, just 25 days later, she complained to the EEOC office.

In short, Warner says that before that day in August of 2018, she knew only that she had not received the promotion to Dover Postmaster; she had no reason to think that decision was based upon unlawful discrimination.  Thus, she believes the 45-day reporting requirement should be tolled until she made that discovery.  See Plaintiff's Opposition Memorandum (document no. 48) at 15-16 (citing Thomas v. Eastman Kodak Co., 183 F.3d 38,

50 (1st Cir. 1999) (holding the administrative limitations
period was tolled because the employee "did not initially have
any crystallized implications or apparent tangible effects" of
discrimination)).

The law on this point - at least in this circuit - is
complex and somewhat convoluted.  At this juncture, the
government's position is insufficiently briefed/developed to
determine whether Warner's claims arising out of her failure to
secure the Durham position are time-barred.  Accordingly, on
that discrete issue, the USPS's motion for summary judgment must
be denied and the court will proceed as though Warner's claims
arising out of the denial of her application for the Durham
postmaster position are timely.

II.  Proper Allocation of the Burden of Proof.

In the typical employment discrimination case (in which the
plaintiff is relying on circumstantial evidence of unlawful
discrimination), courts employ the familiar burden-shifting
framework established in McDonnell Douglas Corp. v. Green, 411
U.S. 792 (1973).  Under that analysis, a plaintiff must first
establish a prima facie case of discrimination by showing that
(1) she is a member of a protected class; (2) she was qualified
for the position she sought; and (3) the employer took a

materially adverse employment action against her (here, the
failure to promote).  If the plaintiff makes that modest
threshold showing, the burden shifts to the employer to
articulate a legitimate, non-discriminatory reason for the
adverse employment action.  As courts have routinely noted, the
employer's burden is simply one of production, not persuasion,
and the plaintiff always retains the ultimate burden of proving
that she was the victim of unlawful discrimination.  See, e.g.,
Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991).
At the third and final stage of the analysis, the plaintiff must
point to evidence showing that the employer's justification for
the adverse employment action is a pretext and the actual reason
was discriminatory.  See, e.g., Theidon v. Harvard Univ., 948
F.3d 477, 496 (1st Cir. 2020).


     But, says Warner, this is not the typical case and she
claims to have "direct" evidence that demonstrates she was the
victim of both age and gender discrimination (that is, the two
comments made by Hayes during Warner's interview for the
Somersworth position).  See Plaintiff's Opposition Memorandum at
14.  Warner says those statements establish that her age and
gender were "motivating factors" in the USPS's decision not to
grant her either of the two promotions she sought.  Moreover,
says Warner, those statements are sufficient to alter the

parties' respective burdens of proof.  See Id.  That evidence,
she says, imposes upon the USPS the obligation to demonstrate
that it would have made the same decision (i.e., not to promote
Warner) even if it had not taken the protected characteristics
of age and/or gender into account.  In short, plaintiffs says
her "direct evidence" that the USPS acted unlawfully by taking
into account her age and her gender makes this a "mixed-motive"
case, rather than a "pretext" case.  See generally 42 U.S.C. §
2000e-2(m).  The court disagrees.

    First, the Supreme Court has made clear that the ADEA does
not "authorize a mixed-motives age discrimination claim."  Gross
v. FBL Fin. Servs., Inc., 557 U.S. 167, 175 (2009).  See also
Id. at 180 ("We hold that a plaintiff bringing a disparate-
treatment claim pursuant to the ADEA must prove, by a
preponderance of the evidence, that age was the 'but-for' cause
of the challenged adverse employment action.  The burden of
persuasion does not shift to the employer to show that it would
have taken the action regardless of age, even when a plaintiff
has produced some evidence that age was one motivating factor in
that decision.").  So, the court need only focus on Warner's
claimed entitlement to a mixed-motive analysis of her Title VII
sex discrimination claim.

According to Warner, Hayes's observation that the Somersworth Post Office had never had a female postmaster establishes - by "direct evidence," no less - that Warner's age was a "motivating factor" in the USPS's decision to deny her the two promotions at issue.  42 U.S.C. § 2000e-2(m).  It does not.  Warner does not have direct evidence that her age was a motivating factor in the USPS's employment decision.  Indeed, she does not even have what might be described as strong or compelling indirect or circumstantial evidence of such discrimination.  Hayes's comment is, at most, weak and inferential support for Warner's claim.

Parenthetically, the court notes that although some courts and practitioners continue to use the phrase "direct evidence" when discussing "mixed-motive" discrimination cases, it is no longer a preferred way to describe the nature or quantum of evidence a plaintiff must produce in order to benefit from the mixed-motive analysis.  The notion that a plaintiff must presented "direct evidence" of unlawful discrimination to obtain a mixed-motive analysis arises from Justice O'Connor's concurring opinion in Price Waterhouse v. Hopkins, 490 U.S. 228, 276 (1989) ("In my view, in order to justify shifting the burden on the issue of causation to the defendant, a disparate treatment plaintiff must show by direct evidence that an

illegitimate criterion was a substantial factor in the decision."). But, that view was later rejected by the Supreme Court in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) (holding that "direct evidence of discrimination is not required in mixed-motive cases" and concluding that "a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex, or national origin was a motivating factor for any employment practice.") (internal punctuation omitted).

So, in the wake of Desert Palace, evidence sufficient to warrant a mixed-motive analysis can be either direct or circumstantial. Such evidence must, however, be particularly compelling - that is to say, it must be sufficient to "demonstrate" that a proscribed characteristic (e.g., gender) "was a motivating factor" in the adverse employment action. 42 U.S.C. § 2000e-2(m). In the 20 years since the Supreme Court's opinion in Desert Palace, the Court of Appeals for the First Circuit has repeatedly described such evidence as "smoking gun proof" or "spot on evidence" that an employer relied upon unlawful characteristics. See, e.g., Theidon v. Harvard Univ., 948 F.3d 477, 495 (1st Cir. 2020); Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 88 (1st Cir. 2018); PowerComm, LLC v.

13

Holyoke Gas & Elec. Dep't, 657 F.3d 31, 35 (1st Cir. 2011);

Ingram v. Brink's, Inc., 414 F.3d 222, 230 (1st Cir. 2005).


Hayes's comment about the (apparently correct) historical
lack of a female postmaster in Somersworth is not evidence of
that sort; it does not "demonstrate" (or even raise a plausible
inference) that gender was a "motivating factor" for the USPS's
decision to promote candidates other than Warner, see 42 U.S.C.
§ 2000e-2(m), nor does it show that the USPS placed "substantial
reliance" on gender in making those hiring decisions.  See
generally, Greene v. Walgreen E. Co., No. 16-2487, 2018 WL
8263947, at *2 (1st Cir. Nov. 15, 2018) (declining to
characterize a memo encouraging plaintiff to step down or resign
rather than apply for a different position as "direct evidence"
of discrimination); PowerComm, 657 F.3d at 35 ("PowerComm also
alleges as legal error that its first two claims should be
judged under mixed-motive analysis, because there is 'direct
evidence' of racial discrimination.  However, 'direct evidence'
refers to 'a smoking gun' showing that the decision-maker relied
upon a protected characteristic in taking an employment action.
PowerComm has adduced no such evidence here.") (citations
omitted; emphasis in original); see also Smith v. F.W. Morse &
Co., 76 F.3d 413, 421 (1st Cir. 1996) (decided before Desert
Palace, but describing such "smoking gun" evidence as

establishing that an employer relied upon a protected
characteristic as a motivating factor in the employment
decision, such as "an admission by the employer that it
explicitly took actual or anticipated pregnancy into account in
reaching an employment decision").

Given the absence of evidence sufficient to demonstrate, by
a preponderance, that Warner's gender was a motivating factor in
the decision not to award her either of the two promotions she
sought, the appropriate framework within which to analyze her
Title VII claim is that established by McDonnell Douglas.
Nevertheless, whether the court analyzes that claim under the
traditional McDonnell Douglas framework or as a "mixed-motive"
case is not outcome determinative.  As the court of appeals for
this circuit has noted, "under both approaches, plaintiffs must
present enough evidence to permit a finding that there was
differential treatment in an employment action and that the
adverse employment decision was caused at least in part by a
forbidden type of bias."  Chadwick v. WellPoint, Inc., 561 F.3d
38, 45 (1st Cir. 2009) (citations and internal punctuation
omitted).  As discussed below, such evidence is lacking in this
case.

III. <u>Evidence of Discrimination</u>.

Under the ADEA, an employer may not "fail or refuse to hire or [] discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C.A. § 623.  Similarly, Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C.A. § 2000e-2.


At the first step of the <u>McDonnell Douglas</u> analysis, it is plain that Warner has made out prima facie claims of both age and gender-based discrimination.  When she applied for the two vacant Postmaster positions she was a member of a protected class under both Title VII and the ADEA - that is to say, she is a woman and she was at least forty years old at the time.  She also had all the necessary minimum qualifications for those positions.  And, finally, she suffered adverse employment actions when she was denied both promotions.  Thus, the burden shifts to the USPS to articulate legitimate, non-discriminatory reasons for the decisions not to promote Warner.

The USPS says Warner's age and gender played no role in its
hiring decisions for the Durham and Somersworth positions.
Warner was not offered either promotion because the candidates
who were hired had more experience of the type needed (that is,
overseeing city delivery routes), were better organized,
presented themselves more impressively in their interviews, and
had demonstrated superior leadership skills.  Those are plainly
legitimate and non-discriminatory reasons for the two hiring
decisions at issue, so the burden reverts to Warner to
demonstrate that they are pretextual and the real reason she was
not promoted was defendant's unlawful discrimination based upon
her age and/or gender.

The Warner offers no evidence that she was denied the Durham
promotion based on her age or gender.  Indeed, she concedes as
much in arguing that her otherwise time-barred claims relating
to that position are subject to equitable tolling.  See
Plaintiff's Opposition Memorandum (document no. 48) at 15-17.
But, even assuming Warren can rely upon the comments Hayes made
during the subsequent Somersworth interview to show that she was
subject to unlawful discrimination when she was denied the
Durham position, that evidence is still insufficient to carry
her burden at summary judgment.

A.   Age Discrimination.

In support of her assertion that she was the victim of
unlawful age discrimination, Warner first points out that the
two postal employees hired in her stead were younger than she.
When she applied for those positions, Warner was 58.  The
candidate hired for the Durham position - Mr. Minigan - was 36.
The candidate hired for the Somersworth position - Mr. Adams -
was 53.


Next, Warner points to the first allegedly revealing
comment Hayes made during her interview for the Somersworth
position - that is, when Hayes asked Warner whether she believed
she "had the energy" to run the Somersworth post office.  From
Warner's perspective, that question is powerful evidence that
Hayes harbored a discriminatory animus against older employees,
presumably based upon stereotyping.  But see Richter v. Hook-
SupeRx, Inc., 142 F.3d 1024, 1032 (7th Cir. 1998) ("[Richter]
points to certain statements made by Simone and Griffith which
he claims indicate that they impermissibly stereotyped older
workers.  Specifically, Simone had voiced concerns that Richter
had a 'low energy level' and was 'resistant to change.'  Richter
claims that these statements are 'prime stereotypes about aging
workers.'  We agree with the district court's conclusions that

18

these statements, standing alone, do not raise an inference of
age discrimination.") (emphasis supplied).


Hayes, on the other hand, has a different explanation and
provided some context for the question.  In her deposition,
Hayes was asked, "Why did you question Ms. Warner's energy?"
Hayes responded, in part, by explaining:

> That was a valid question for this office, this
> particular office.  Not every office is created equal.
> The Somersworth post office was a very volatile,
> hostile office.  Liz had already been dealing with a
> carrier in her office that was basically like the
> majority of what we dealt with in Somersworth.
>
> Liz, I know what that did to her.  And just because
> she doesn't have the energy doesn't make her not
> qualified or qualified.  That was a valid question to
> ask.  I wanted her to be aware of what was going on in
> Somersworth.  My entire POOM group was aware of what
> was the environment in Somersworth at that time.  It
> wasn't that I was telling her that you don't have the
> energy.  It was simply about questioning during the
> interview; did you realize what this post office is
> about, do you have the energy based on what she
> already had going - or had been going through in her
> own office in Newmarket.
>
> * * *
>
> We had spoken about the energy.  I knew Liz was
> working long hours and hard in Newmarket.  There was
> no question about that, but going from Newmarket into
> the Somersworth post office was like night and day.  I
> knew she had already told me through a couple of
> conversations or during conversations that she had
> been working long hours, and she was there all the
> time.  And I knew that in my head.  So I just wanted
> to make sure that we had this conversation.  That it
> was going to go from almost bad to worse.  I couldn't

have put her in there.  It would have been a
disservice knowing that if I did not have that
conversation with her.

Hayes Deposition (document no. 52-3) at 25, 30.  In her

affidavit, Hayes added the following:

> I have a recollection of making a comment about
> needing a lot of energy to keep things in shape when
> speaking about the Somersworth position.  My concern
> was that Liz was not keeping up with the daily tasks
> even in a small post office.  Being a working
> postmaster requires a lot of time and effort.  There
> is no one to help you and it is very easy to fall
> behind.  Liz had difficulty juggling getting the mail
> delivered, keeping up with administrative duties and
> conducting her EEO investigations.  The environment in
> Somersworth was even more demanding.  It is much
> larger office and needed supervision from opening to
> closing.  Being a working postmaster requires a lot of
> stamina both physically and mentally.  It would have
> just been Liz and a supervisor to address the normal
> daily tasks on top of the constant grievance
> activities and multiple harassment charges brought on
> by the carriers against management.  I did not feel
> Liz was the right person based on her demonstrated
> ability while in Newmarket.

Hayes Affidavit (document no. 49-1) at para. 29.

Finally, in support of her age discrimination claims Warner

points out that she had generally favorable annual performance

reviews and says she had more experience than the candidate

hired for the Durham position and at least comparable experience

to the candidate hired for the Somersworth position.  But, of

course "experience" and "competence" are not synonymous.  And,

this court's role is not to determine whether the USPS's hiring decisions were unwise, or unfair, or even arbitrary; it is to determine whether there is sufficient evidence of unlawful discrimination to permit Warner's claims to go to a jury.  See generally Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990) ("On appeal our role is not to second-guess the business decisions of an employer, nor to impose our subjective judgments of which person would best fulfill the responsibilities of a certain job.").

From Hayes's perspective, Minigan and Adams gave her more reasons to have confidence that they were best suited to the positions for which they were hired.  As a regional supervisor, Hayes was familiar with the work of all three applicants.  While Hayes acknowledged that Warner worked hard and put in long hours, she seems to have considered Warner's overall performance to have been merely "fine" or "adequate," with ample room for improvement.  For example, Hayes testified that during her daily telephone conferences with offices that managed city delivery:

> Warner was rarely ready to report out with a full
> explanation of the previous day's events and what
> caused the overages.  Warner could rarely speak to the
> high amount of office hours used each day.  Warner was
> not familiar with how to calculate the office hours
> and what action was necessary to address the office
> hours.  When I instructed Warner to perform an office
> count of particularly poor performing carriers she did

not always follow through.  When she did follow
through, she was not familiar with how to correct the
carrier deficiencies and did not document per the M38
(Managers City Delivery Handbook) and M41 (City
Carrier's Handbook).  I spent many hours reviewing the
city delivery office time with Warner, even assigning
tasks for certain individuals that she supervised in
order to get the numbers down for those who needed the
most help, yet she did not develop her city delivery
skills.

Hayes Affidavit at paras. 9-10.  <u>See also</u> Warner's Annual

Performance Reviews (documents no. 52-14, 52-15, and 52-6).[2]


    The vacant postmaster positions in Durham and Somersworth

were filled in slightly different ways, so it is, perhaps, worth

discussing them in some detail.  Candidates for the Durham

position were subject to a preliminary screening process before

their applications were provided to Hayes.  Ten people applied

for the position and an "applicant review team" scored each of

them.  Hayes then interviewed the five candidates who had

received the highest scores.  Warner was in that group of five,

as was the candidate whom Hayes eventually hired, Mr. Minigan

(who, perhaps not coincidentally, had received the highest score

from the applicant review team).  Hayes explained her decision

to hire Minigan rather than Warner as follows:

---

[2]    The record does not contain the annual performance reviews
of the candidates who were offered the postmaster positions for
which Warner had applied, so there is no basis for comparison.

Of all of the criteria needed to make my decision for
the Durham and Somersworth postmaster jobs,
productivity in City Delivery was one of the most
significant factors.  While Warner met the basic
criteria to perform a postmaster's duties, Minigan and
Adams [the candidate who transferred from Maine to the
Durham post office] had more City Delivery experience.

Warner seemed to disregard her lack of skills as being
an important factor in upward mobility to a higher-
level office.  I say this because Newmarket was always
the worst performing office in my POOM group and
remained that way while Warner was assigned to the
office.  I went so far as to develop my own team of
Postmasters to perform yearly 3999's (walks with
carriers) and Warner was part of the team, yet she did
not make any improvements in her own office.  Rather I
heard multiple excuses as to why the carrier should be
given a break because of various personal reasons.

John Minigan ("Minigan") was the postmaster in
Deerfield, NH, a level 18 at the time he applied for
the Durham Postmaster position.

I had awarded Minigan the position in Deerfield based
on his extensive knowledge of City Delivery, as well
as my impression of the quality of his work.

Minigan had worked on many special teams as a Team
Leader for City Delivery Inspections as well as
instructed many trainings for City Delivery.  As a
matter of fact, often I would request that Minigan
fill in for me on our daily telecoms and run them in
my absence.

Minigan showed consistent and solid management in the
Deerfield post office.  He was considered one of the
leaders in City Delivery.  For these reasons, I felt
that Minigan was the best candidate for the Durham
postmaster position.


Hayes Affidavit at paras. 11-16.

Finding a candidate to fill the vacant Somersworth postmaster position did not involve an "applicant review team" (seemingly because it involved only a few candidates, one of whom was seeking a lateral transfer from another postmaster position).  Although it is not entirely clear, it appears that applications for the vacant Somersworth position were provided directly to Hayes.  As for her hiring decision with regard to that position, Hayes explained:

> In August, 2018, Warner interviewed for the Somersworth Postmaster position, along with John Riley.  [A third candidate,] David Adams had requested a lateral transfer from the South Berwick, Maine Postmaster position.
>
> Prior to David Adams' lateral transfer to the Somersworth Postmaster position, he had been the Postmaster in the South Berwick office, a position that I awarded him.  Prior to that, he had been the OIC in Barrington.
>
> The South Berwick office consisted primarily of city delivery.  Adams made numerous improvements while he was in South Berwick.
>
> Prior to South Berwick, Adams had a supervisory position in the Portsmouth, N.H. office, which was the largest office in the group consisting of 20 to 30 city routes.  Needless to say, Adams had extensive experience with city delivery.
>
> As for the Somersworth Post Office, I had similar concerns with awarding Warner the postmaster position, perhaps even more so because Somersworth Post Office was notoriously a difficult city delivery office to manage.  It was 100% city delivery with no rural delivery, one supervisor and a few clerks.

The past managers that oversaw the Somersworth office did not manage the carriers for fear of retaliation from the carrier craft.  There was always upheaval, many grievances, chaos and verbal and physical altercations amongst the employees.  It was truly a challenge and was going to require a solid plan to upright the office.  Somersworth was also a Level 20 office consisting of 10 to 15 city routes (not exactly sure).

Adams came to the interview with a specific plan to reduce overtime, street time and improve the Office Time.  Adams had visited the Somersworth Post Office and made several recommendations to change the flow of the Retail Lobby and arrange the carrier cases to improve the congestion on the workroom floor.  Adams also had extensive knowledge in the grievance process which was a factor at the Somersworth Post Office given the grievance history.  Adams was prepared for the interview as he brought the performance reports as well as the retail revenue reports to support his recommendations.  Adams had a vision and a plan of action, and based on that, plus his experience, and his performance during the interview, I believed Adams was the best candidate for the Somersworth Postmaster position and recommended that he be offered the job because of that.

Not only did Adams put the time and effort into creating a plan to upright the Somersworth post office, he also had personal reasons for wanting the lateral move.  His granddaughter had recently been diagnosed with a medical condition so he wanted to be closer to his family reducing his commute and making him more available for them while still being able to do his job.

When I interviewed Warner for the Somersworth position, she did not provide anything that lead me to believe she put the time and/or effort into researching anything about the Somersworth Post Office.  She didn't even visit the office.  When I asked her why she didn't visit the office, she replied because she lived in Somersworth.  Warner did not have a plan to do anything to improve any area of the office.  Her answers were vague and carried no weight in my opinion.

25

Hayes Affidavit at paras. 18-26.  For her part, Warner disputes
Hayes's assertion that she "didn't visit the [Somersworth]
office," or that she lacked a plan to improve that office
(though it is unclear how or even whether Warner actually
communicated that plan to Hayes during the interview; she
concedes that she did not submit anything in writing to Hayes.
See Warner Deposition (document no. 52-5) at 9).

Based upon this record, and even construing any ambiguities
in favor of Warner, there is insufficient evidence of age
discrimination to permit a properly instructed jury to conclude
that Warner was the victim of unlawful discrimination, in
violation of the ADEA.  In short, the only suggestion that age
played any role in Hayes's hiring decision is the fact that the
candidates hired were younger than Warner; at the time, Warner
was 58, the Durham candidate was 36, and the Somersworth
candidate was 53.  Additionally, Warner relies upon Hayes's
question (made during her interview for the Somersworth
position) about whether Warner "had the energy" to succeed in
the position.  But, that evidence is, at best, particularly weak
support for an age discrimination claim.  First, Hayes fully and
plausibly explained the basis for that question.  Second, Hayes
hired a person in the protected class for that position - that

is, someone over the age of 40.  See, e.g., Richter, 142 F.3d at
1032 ("In support of the conclusion that the evidence here does
not lead to an inference of age discrimination, we note a few
additional significant facts.  Revco's decision-makers were
themselves 46, 53, and 60 years old at the time of the decision.
While not dispositive, this Court has found it significant that
individuals alleged to have discriminated on the basis of age
were themselves members of the protected class."); Roussin v.
Covidien LP, No. 13-12539-FDS, 2016 WL 393182, at *15 (D. Mass.
Feb. 1, 2016) ("In addition, although not dispositive, any
inference of age discrimination is further weakened by the fact
that . . . the managers who made the firing decision were
themselves members of the same protected class."); Mathews v.
Huntington, 499 F. Supp. 2d 258, 267 (E.D.N.Y. 2007) (same)
(collecting cases).

And, finally, even if a trier-of-fact were to completely
discredit Hayes's explanation for the question, it would be an
unsustainable leap to conclude that Hayes's inquiry evidenced a
bias against older employees.  Viewed in its totality, the
evidence upon which Warner relies for her age discrimination
claims is insufficient to survive summary judgment; she has
shown neither pretext nor discriminatory animus.  Consequently,

as to count one of Warner's complaint, the government is entitled to judgment as a matter of law.

       B.    Sex Discrimination.

In support of her claim that she was the victim of unlawful gender-based discrimination, Warner points to the second comment Hayes made during the Somersworth interview - that is, Hayes's observation that the employees at the Somersworth post office had never had a female supervisor before, followed by her statement "I wonder how that would work." <u>See</u> Hayes Deposition (document no. 48-1) at 78. Warner believes that comment is undeniable and persuasive evidence that Hayes favored a man in that position, rather than a woman. Hayes denies any such thing and, when questioned about that comment at her deposition, she responded as follows:

> Q.  Why did you make that statement?
> A.  Because they never had a female postmaster or a manager in there.
> Q.  How do you think they would react?
> A.  That was my question. I wondered how they would react.
> Q.  And what were your thoughts about how they would react?
> A.  I didn't have any thoughts.  It was a question that I did not have any thoughts on.
> Q.  Did you have a hunch about how they would react?
> A.  No.
> Q.  Did you make the statement because you believed the Somersworth, New Hampshire, employees would be more insubordinate towards a woman supervisor?
> A.  No.

```
Q.   And while you were interviewing the male
     applicants for the Somersworth post office, did
     you wonder how they would react to a male
     supervisor supervising them?
A.   No.
Q.   And why didn't you wonder about that?
A.   Because they had always had males supervising
     there.
```

Hayes Deposition (document no. 48-1) at 78-79.  In her

affidavit, Hayes discussed in a bit more detail what motivated

that comment.

```
I do recall having a conversation with Warner about
the difficult employees at the Somersworth Post
Office.  We agreed that it had been like that for many
years.  It occurred to me at that very second all the
managers that had worked at the Somersworth Post
office had consisted of entirely men.  Not one woman
to my knowledge had managed the office.  Having worked
with Warner for many years I had an out loud thought
and said, "I wonder what it would look like if a woman
managed the office?" It was in no reference to any one
woman in particular - just stating a fact.  In my head
I was complimenting women leaders.

Each post office has its own story, its own set of
issues and its own cast of characters that makes it
unique. I am the POOM for many post offices. I was
just stating a fact, and trying to put a picture
together of the employees within that post office.
```

Hayes Affidavit at paras. 27-28.


     As additional support for her gender-based discrimination

claim Warner relies upon a statement made by Hayes long after

Warner was passed over for the Durham and Somersworth positions

in 2018.  Specifically, Warner alleges that on January 4, 2020,
at an annual meeting of postmasters, Hayes referred to a group
of five men at the meeting as "smoking" - as Warner sees it, an
unequivocal reference to their attractive physical appearance.
That, says Warner, is further evidence of Ms. Hayes's bias
against women.

Hayes has a different take on that statement and
categorically denies referring to the men as "smoking" - at
least as that term might refer to their physical appearance.
Hayes Deposition (document no. 52-3) at 4.  Hayes explained that
the theme of that meeting was "being on fire" and described it
as follows:

> The group meeting was all about our performance in
> POOM [Post Office Operating Manager] Group 4.  We were
> doing very well in our group where POOM 4 was, I would
> say, usually at the bottom of the POOM groups in
> performance.  So I created a whole PowerPoint slide.
> And I had a lot of information, and it was a
> celebration.  I even had fire.  The theme of the
> meeting was basically about fire, how our group was on
> fire and where there's smoke, there's fire, and people
> are, you know, doing wonderful here and there.
>
> So, during the conversation I had recognized a lot of
> people.  I had given out some service pins and things
> like that.  I also wanted to recognize that we had
> several individuals in the audience that had done a
> tremendous job in their post office.
>
> These five men or young men were sitting next to each
> other, and I said I would like to identify and
> recognize these people.  So they stood up and

> everybody clapped.  I said these guys - and I went on
> to talk about how well they were doing.  They were
> OICs [Officers in Charge] in their offices.  They were
> working hard.  They were making differences and I said
> they were smoking in the offices.  That was the
> context of it all.  And everybody left and clapped.
> They sat down, and that was the end of it.

Deposition of Kathleen Hayes (document no. 52-3) at 5-6.


Hayes's account is supported by the testimony of Paul
Ansaldi, a 38-year veteran of the Post Office and former
colleague of both Warner and Hayes.  Ansaldi attended the
meeting and described it (and Hayes's comments) as follows:

> I attended the January 14, 2020 Postmaster.  First,
> there was a theme to the meeting.  POOM group (4)
> which had performed poorly for several years (prior to
> Kathy Hayes getting the job) was on fire.  Ms. Hayes
> wanted to celebrate the success of the entire group,
> not individuals.  The successes that were celebrated
> were: accidents were down, productivity was up, budget
> hours were being saved, employee availability was up,
> and overtime hours were down as well.  Secondly, Ms.
> Hayes said: "these men are smoking IN THEIR OFFICES."
> The individuals (I believe two were females) at my
> table were not taken back by it.  There were not any
> sighs, gasps, etc.  It was never discussed.  The
> remark was appropriate for the meeting.

Affidavit of Paul Ansaldi (document no. 49-2) at para. 5.  In
other words, Ansaldi interpreted the statement as Hayes claims
to have intended it: an acknowledgement that the five men were
performing at an extremely high level.  See Hayes Deposition at
11 ("Let me clarify it.  I did not call them 'smoking OICS.'  I

31

said they were smoking in their offices.  Their numbers were
good.  So on.  The answer is: No, I did not call or refer to
anyone as 'smoking OICS.'").

Hayes's comment in 2020 does little to support Warner's sex
discrimination claim.  Moreover, the fact that the comment was
temporally remote from, and entirely unrelated to, Hayes's 2018
hiring decisions with respect to Warner further weakens any
plausible inference that Warner was the victim of gender-based
discrimination.  See, e.g., McMillan v. Massachusetts Soc. for
Prevention of Cruelty To Animals, 140 F.3d 288, 300-01 (1st Cir.
1998) ("[E]ven if the remarks are relevant for the pretext
inquiry, their probativeness is circumscribed if they were made
in a situation temporally remote from the date of the employment
decision or if they were not related to the employment decision
in question.") (citations omitted).

Finally, Warner points out that during her career with the
USPS, Hayes promoted approximately 36 people, but only 13 of
them were women (roughly 35 percent).  See Plaintiff's
Opposition Memorandum (document no. 48) at 9.  But, of course,
without knowing the total number of applicants for those
positions and their gender, such a statistic provides no
evidence of gender bias.  Absent additional relevant

information, those numbers are no more illuminating or
persuasive than, say, the fact that Warner applied for and was
denied at least 24 promotions during her career at the USPS.
See Plaintiff's Opposition Memorandum, at 17.  Without some
context, unfounded inferences might be drawn from either of
those factual statements.

     Viewing the totality of the record evidence in the light
most favorable to Warner, the court is constrained to conclude
that it is not sufficient to permit a properly instructed jury
to find that Warner was the victim of unlawful gender-based
discrimination.  Reaching such a conclusion would require a
trier-of-fact to engage in unsupported speculation and draw
unsustainable inferences from the sparse evidence presented.
Warner has not met her burden to show that there exists a
genuine dispute of material fact with respect to either pretext
or discriminatory animus.  As to count two of Warner's
complaint, then, the government is entitled to judgment as a
matter of law.

### Conclusion

     Counsel for Warner has done a fine job marshaling the
available evidence and presenting it in a way that most
favorably supports Warner's claims.  But, in the end, this is

not a close case.  The evidence presented is simply too weak and would require a trier-of-fact to draw too many unsupported inferences to conclude that Warner was the victim of unlawful discrimination.  This is all the more true because Hayes is a woman and roughly the same age as Warner which, although plainly not dispositive, does further weaken the tenuous inferences of unlawful gender and age discrimination upon which Warner relies.

    As noted above, this court's role is not to determine whether the USPS's hiring decisions were wise or fair, or whether the USPS hired the "best" or most qualified candidate for the vacant positions.  The court must determine solely whether Warner has met her burden to show the existence of a triable question of fact related to pretext or discrimination.  She has not.  For the foregoing reasons, as well as those set forth in the government's legal memorandum (document no. 33-1) and supporting materials, the government's motion for summary judgment (**document no. 33**) is granted.  In the exercise of the court's discretion, and for the reasons set forth in the government's legal memoranda, the government's motion to supplement the declarations of Kathleen Hayes and Paul Ansaldi (**document no. 49**) is granted.  All other pending motions are denied as moot.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 26, 2024

cc:  Counsel of Record